**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Mary Louise Hurd, et al.,

Plaintiffs,

v.

City of Phoenix, et al.,

Defendants.

No. CV-25-04442-PHX-KML

**ORDER**

This case arises from the arrest and sudden death of Benjamin Nathaniel Austin while in police custody. Plaintiffs—the personal representative of Austin's estate and his surviving relatives—allege City of Phoenix police officers unlawfully arrested Austin and denied him adequate medical care while detained. Their first amended complaint asserts Fourth and Fourteenth Amendment claims against five officers and the City of Phoenix under 42 U.S.C. § 1983. (Doc. 5.) Defendants moved for dismissal of all claims except Count One against Detective Jason Hamernick. (Doc. 14.) Viewing the amended complaint in the light most favorable to the plaintiffs, the allegations do not state any plausible claims for relief against the moving defendants. The partial motion to dismiss is therefore granted.

## I. Background

Plaintiffs allege on October 2, 2023, Phoenix police officers responded to a call from a complainant who accused Austin of assaulting her and forcing her to walk to his apartment with a "knife pressed against her back." (Doc. 5 at 8.) At the time, Austin was on supervised probation for aggravated assault. (Doc. 5 at 10 n.2.) Hamernick, a Phoenix

Police Department detective, investigated the incident and determined there was probable cause to arrest Austin for kidnapping and aggravated assault despite allegedly-conflicting statements from the complainant. (Doc. 5 at 4, 8–9.) Hamernick relayed his conclusion to the 41X Neighborhood Enforcement Team, whose officers—including defendants Carmina Theriault, Jason Scoggins, and David Murphy—subsequently developed a plan to arrest Austin outside his home and execute a search warrant on the property. (Doc. 5 at 4–5, 8–9.)

On November 29, Theriault and Murphy drove by the rear of Austin's property in an unmarked vehicle. As they did, Austin emerged from his apartment and "made contact with" Theriault while Murphy "remained hidden from view." (Doc. 5 at 9–10.) Theriault allegedly told Austin she was a city Neighborhood Services Department employee "following up on a complaint regarding trash and transient issues." (Doc. 5 at 10, 11.) Austin agreed to continue his conversation with Theriault and walked around to the front of the property to do so. As Theriault and Murphy drove around to the front to meet him, Officers Scoggins and Mark Helmkamp waited nearby. (Doc. 5 at 10.) Theriault then exited the vehicle wearing her police vest. Murphy "followed closely behind, approached [Austin] from the rear, and placed him under arrest." (Doc. 5 at 11.) Theriault and Scoggins told Austin why he was being arrested, and Murphy conducted a search incident to arrest. Theriault, Murphy, Scoggins, and Helmkamp then remained at the property to execute the search warrant while other officers transported Austin to the police station so Detective Hamernick could interview him. (Doc. 5 at 11.)

At approximately 12:17 p.m., officers placed Austin alone in an interview room and handcuffed him to the table. (Doc. 5 at 11.) About ten minutes later, they told Hamernick that Austin was there and ready for questioning. Instead of interviewing Austin immediately, Hamernick decided to monitor Austin via surveillance cameras while waiting to see if the search warrant produced any evidence. Austin remained alone in the interview room for approximately 39 minutes. (Doc. 5 at 12.) Plaintiffs allege that during this time, video footage shows Austin "struggling to maintain consciousness," "breathing heavily,"

and "slumping over to his left side." (Doc. 5 at 12, 19.) "At some point" Hamernick thought Austin "was snoring and sleeping." (Doc. 5 at 12.) The footage also allegedly shows Austin "forcefully hitting his head on the wall" and then "sliding down in his chair," at which point his breathing became "noticeably slower" until he ultimately took his last visible breath. (Doc. 5 at 19.) Plaintiffs allege Hamernick did not enter the interview room until around 1:05 p.m., approximately twelve minutes after Austin stopped breathing. (Doc. 5 at 12, 19.) Once Hamernick realized Austin was unresponsive, he shouted for help and officers administered CPR and Narcan until first responders arrived. Austin arrived at the hospital around 1:32 p.m. and died the next day. (Doc. 5 at 12.)

Based on these factual allegations, plaintiffs assert six counts under 42 U.S.C. § 1983.[1]

- Count One: Fourth Amendment false arrest against Hamernick, Theriault, Murphy, Scoggins, and Helmkamp.
- Count Two: a claim against Phoenix under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978), based on a custom or pattern of warrantless arrests without probable cause.
- Count Three: Fourteenth Amendment right-to-medical-care claim against Hamernick.
- Count Four: another *Monell* claim against Phoenix based on a custom or pattern of depriving detained individuals of adequate medical care.
- Count Five: Fourteenth Amendment denial-of-companionship claim against Hamernick.

[1] Plaintiffs' first amended complaint asserted claims against the City of Phoenix, thirteen named officers, the officers' unnamed spouses, "John and Jane Does 1–10," and "XYZ Entities 1–10." (Doc. 5.) On May 7, 2026, plaintiffs voluntarily dismissed their claims against eight named officers and their spouses, as well as their punitive damages claim against Phoenix. (Doc. 21.) This court ordered all unserved defendants as of March 6, 2026 to be terminated from the case. (*See* Doc. 6.) Therefore, all unserved defendants are dismissed, and only plaintiffs' claims against five named officers and Phoenix (for compensatory damages) remain.

- Count Six: another *Monell* claim against Phoenix—apparently relying on the same practice alleged in Count Four—based on deliberate indifference towards plaintiffs' interest in continued companionship with Austin.

(Doc. 5.) Defendants move to dismiss all counts except Count One against Hamernick. (Doc. 14.)

## II. Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (simplified). This is not a "probability requirement," but a requirement that the factual allegations show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. The court construes the allegations of the complaint "in the light most favorable to the plaintiff." *Abramson v. Brownstein*, 897 F.2d 389, 391 (9th Cir. 1990).

## III. Analysis

### A. Claims Against the Officers

Plaintiffs assert one Fourth Amendment false-arrest claim against Hamernick, Theriault, Murphy, Scoggins, and Helmkamp, and two Fourteenth Amendment due process claims against Hamernick. Plaintiffs allege all officers "are liable both personally and professionally." (Doc. 5 at 16, 20, 25.) In referring to the officers as "professionally" liable, plaintiffs appear to allege an official-capacity claim.

#### 1. Fourth Amendment False-Arrest Claim

Count One alleges Hamernick, Theriault, Murphy, Scoggins, and Helmkamp arrested Austin without a warrant or probable cause in violation of the Fourth Amendment. (Doc. 5 at 14; *see* Doc. 21.) Because defendants do not seek to dismiss Count One against

Hamernick in his personal capacity, the only question is whether that count should be dismissed as against Theriault, Murphy, Scoggins, and Helmkamp. Defendants contend it should because plaintiffs failed to allege the other officers' reliance on Hamernick's probable-cause determination was not objectively reasonable.[2] (Doc. 14 at 5–6.)

In general, law enforcement officers may "rely on information obtained from fellow law enforcement officers." *Motley v. Parks*, 432 F.3d 1072, 1081 (9th Cir. 2005) (en banc), *overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012). This remains true even when the information is erroneous and relying on it leads an officer to unwittingly violate the Fourth Amendment. *See United States v. Hensley*, 469 U.S. 221, 232 (1985). So long as an officer has an "objectively reasonable, good-faith belief that he is acting pursuant to proper authority, he cannot be held liable if the information supplied by other officers turns out to be erroneous." *Motley*, 432 F.3d at 1082; *see also, e.g.*, *United States v. Robinson*, 536 F.2d 1298, 1299 (9th Cir. 1976); *Torres v. City of Los Angeles*, 548 F.3d 1197, 1212 (9th Cir. 2008); *Green v. City & Cnty. of San Francisco*, 751 F.3d 1039, 1045 (9th Cir. 2014); *Sims v. Brown*, No. 23-35545, 2024 WL 1854284, at *4 (9th Cir. Apr. 29, 2024).

Plaintiffs have not alleged facts which plausibly support their claim that the officers' reliance on Hamernick's "bare assertion" that probable cause existed was "unreasonable." (Doc. 5 at 16.) Although plaintiffs suggest Hamernick's probable-cause determination itself was suspect (*see* Doc. 5 at 9), this has no bearing on the other officers' liability when plaintiffs have not alleged those officers doubted or objectively should have doubted the validity of Hamernick's determination. *See Robinson*, 536 F.2d at 1299 (officers "cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information"). Absent any facts suggesting the officers' reliance on Hamernick's statement was objectively unreasonable, plaintiffs have failed to state a plausible claim.[3] Count One

[2] Defendants also contend Count One should be dismissed against the four officers because plaintiffs did not specify which one arrested Austin (Docs. 14 at 4; 22 at 5), but the amended complaint identifies Murphy as having placed Austin under arrest (Doc. 5 at 11).

[3] Defendants alternatively argue that even if plaintiffs alleged plausible claims in Count One, dismissal is warranted for Helmkamp, Murphy, Theriault, and Scoggins because they are entitled to qualified immunity. (Doc. 14 at 5.) Because plaintiffs failed to state a

against officers Murphy, Theriault, Scoggins, and Helmkamp is dismissed.

**2. Fourteenth Amendment Inadequate-Medical-Care Claim**

Count Three alleges Hamernick violated Austin's right to adequate medical care as a pretrial detainee under the Due Process Clause of the Fourteenth Amendment. (Doc. 5 at 18–20.) In the Ninth Circuit, "claims for violations of the right to adequate medical care brought by pretrial detainees against individual defendants under the Fourteenth Amendment must be evaluated under an objective deliberate indifference standard." *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) ("*Gordon I*") (simplified). Under this standard, a plaintiff must plausibly allege four elements:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* at 1125. Even viewed in the light most favorable to plaintiffs, the amended complaint lacks factual allegations making it plausible that Hamernick acted with deliberate indifference to Austin's medical needs. *See Iqbal*, 556 U.S. at 678.

First, the court assumes that Hamernick's choice to leave Austin alone in the monitored interview room while awaiting execution of the search warrant (Doc. 5 at 12) satisfies *Gordon I*'s intentional-decision element.

As to the remaining elements, however, plaintiffs do not allege facts which show Hamernick was objectively deliberately indifferent to a substantial risk of serious harm—that is, conduct that was "objectively unreasonable" in the context of this particular case. *Gordon I*, 888 F.3d at 1125. To establish deliberate indifference, plaintiffs must show a defendant's conduct amounted to "more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* Plaintiffs point to *Gordon v. County of Orange*

---

plausible Fourth Amendment claim against any of the four officers, the court need not reach the question of qualified immunity.

(“*Gordon II*”), which established that “pre-trial detainees . . . have a right to direct-view safety checks sufficient to determine whether their presentation indicates the need for medical treatment.” 6 F.4th 961, 972–73 (9th Cir. 2021). But *Gordon II* did not establish what is required for a “direct-view safety check” to be “sufficient” or “adequate”; that case relied on other decisions in which the failure to conduct safety checks apparently violated established policies. *Id.* at 972–73 (citing *Wereb v. Maui Cnty.*, 727 F. Supp. 2d 898 (D. Haw. 2010); *Est. of Abdollahi v. Cnty. of Sacramento*, 405 F. Supp. 2d 1194, 1206–07 (E.D. Cal. 2005)).

Plaintiffs’ allegations are too vague to demonstrate that Austin’s monitoring was insufficient or inadequate. Nothing in their amended complaint suggests Hamernick violated any policy by monitoring Austin via video or that a reasonable official would have known, given the facts available when the decision was made, that leaving Austin alone for less than an hour in a monitored interview room was objectively risky or dangerous. *Cf. Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1098 (9th Cir. 2006) (the Fourth Amendment does not require an “officer to provide what hindsight reveals to be the most effective medical care for an arrested suspect”). Nor does the complaint allege Austin had a preexisting condition of which a reasonable official would have or should have been aware, and which would make otherwise reasonable conditions of confinement especially risky for *him*. Even taking as true plaintiffs’ allegation that Hamernick did not enter the room despite visible signs of Austin’s medical distress (*see* Doc. 5 at 19), they do not allege Hamernick continuously monitored the cameras such that he saw or should have seen anything amiss. They only contend that “at some point” Hamernick believed Austin was asleep, but do not indicate when or how Hamernick reached that conclusion, nor provide facts to suggest the conclusion was objectively unreasonable at the time it was made. (Doc. 5 at 12.)

Ultimately, even if Hamernick’s monitoring of Austin amounted to negligence, “an inadvertent failure to provide adequate medical care” does not satisfy the deliberate-indifference standard. *Fraihat v. U.S. Immigr. & Customs Enf’t*, 16 F.4th 613, 636 (9th Cir.

2021) (simplified). On these facts, plaintiffs have not plausibly alleged that Hamernick caused Austin harm with anything "akin to reckless disregard." *Gordon I*, 888 F.3d at 1125. Indeed, contrary to their contention that Hamernick "delay[ed] in providing care" (Doc. 5 at 19), he called for help and rendered aid as soon as it became clear Austin was unresponsive (Doc. 5 at 12). For these reasons, Count Three against Hamernick is dismissed.

### 3. Fourteenth Amendment Familial-Association Claim

Count Five alleges Hamernick deprived plaintiffs of their Fourteenth Amendment liberty interest in Austin's continued companionship. This claim appears to rest largely on the claim in Count Three that Hamernick's "deliberate indifference towards [Austin's] right to adequate medical care demonstrated conduct that shocks the [conscience]" and resulted in his death. (Doc. 5 at 24.)

To raise a plausible Fourteenth Amendment familial-association claim, plaintiffs must show an officer's actions "shocked the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). Showing deliberate indifference is one way to satisfy this standard; the other requires showing a purpose to "cause harm unrelated to the legitimate object of arrest." *Id.* at 1140 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 836 (1998)). Where officers have time to deliberate before acting, the deliberate-indifference standard applies and plaintiffs "may prevail by showing that the officer disregarded a known or obvious consequence of his action." *Nicholson v. City of Los Angeles*, 935 F.3d 685, 693 (9th Cir. 2019). But where deliberation is not practical because of exigent circumstances, the purpose-to-harm standard applies. *See Porter*, 546 F.3d at 1137.

Although the parties quibble over which standard applies here (*see* Docs. 14 at 8; 20 at 10–11), plaintiffs have not made the requisite showing under either one. The amended complaint lacks factual allegations to suggest Hamernick was deliberately indifferent to Austin's medical needs. Because plaintiffs have not demonstrated Hamernick's conduct was "akin to reckless disregard," *Gordon I*, 888 F.3d at 1125, it follows that they have not met the higher standard of showing Hamernick purposely acted to harm Austin either. The

amended complaint does not suggest Hamernick even knew Austin needed medical care until entering the interview room around 1:05 p.m., at which point he immediately rendered aid. (Doc. 5 at 12.) Accordingly, Count Five against Hamernick is dismissed.[4]

**4. Official-Capacity Claims**

Defendants also contend any claims against the officers in their official capacities should be dismissed because they are duplicative of plaintiffs' *Monell* claims against Phoenix. (Doc. 14 at 12.) An official-capacity suit against a municipal officer "is, in all respects other than name, to be treated as a suit against the entity," *Kentucky v. Graham*, 473 U.S. 159, 166 (1985), and where both types of claims are asserted, a court may dismiss official-capacity claims as redundant. *Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008). Plaintiffs' claims against Hamernick in his official capacity are therefore dismissed. Plaintiffs may continue to pursue Count One against Hamernick in his personal capacity. For the reasons previously discussed, Counts Three and Five are dismissed in their entirety.

**B. *Monell* Claims Against City of Phoenix**

Plaintiffs raise three *Monell* claims against Phoenix which parallel their claims against the individual officers. To establish municipal liability, plaintiffs must show: (1) a constitutional right was violated by an officer as an employee of the city; (2) Phoenix has a policy, practice, or custom which amounts to deliberate indifference to that constitutional right; and (3) that policy, practice, or custom was the moving force behind the violation, such that an appropriate policy could have prevented the violation. *See Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1193–94 (9th Cir. 2002), *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016). Policies of inaction or omission can create liability, but only if plaintiffs can show the "omission reflects a deliberate or conscious choice"—in other words, that Phoenix "was on actual or constructive notice that its omission would likely result in a constitutional violation." *Id.* at 1186, 1194 (simplified).

---

[4] As with Count One, the court need not assess Hamernick's qualified immunity defense for Counts Three and Five because plaintiffs failed to state plausible Fourteenth Amendment claims. (*See* Doc. 14 at 10.)

**1. Liability for Alleged False Arrest**

Count Two seeks to establish municipal liability for the false arrest alleged in Count One. Because defendants do not seek dismissal of plaintiffs' claim that Hamernick violated Austin's Fourth Amendment right, the court will assume plaintiffs have pleaded facts which could plausibly satisfy the first element of *Monell*. But as to the second element, plaintiffs have failed to identify with specificity any policy, practice, or custom which amounts to deliberate indifference to that right.

As an initial matter, it is not entirely clear what policy plaintiffs seek to challenge; they describe only a policy or custom regarding "effecting warrantless arrests in situations such as the one involving [Austin]." (Doc. 5 at 17.) Parsing through that confusing language, plaintiffs seem to argue Phoenix had a practice of conducting warrantless arrests without probable cause. (*See* Doc. 5 at 17–18.) Assuming that to be their claim, plaintiffs have not alleged facts which plausibly show the existence of any such practice.

It is "well established in the Ninth Circuit that a plaintiff seeking to assert [a *Monell*] claim must allege *facts* that would support the existence of the alleged policy, practice, or custom." *Warren v. Penzone*, No. CV-22-02200-PHX-DWL-CDB, 2023 WL 7686666, at *6 (D. Ariz. Nov. 15, 2023) (citing *A.E. ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012); *Dougherty v. City of Covina*, 654 F.3d 892, 900–901 (9th Cir. 2011)). It can be difficult for plaintiffs to plead a viable *Monell* claim before obtaining discovery, but they still must allege sufficient facts to get beyond the pleading stage. *See Iqbal*, 556 U.S. at 678. Here, plaintiffs rely entirely on a 2024 Department of Justice ("DOJ") report regarding the Phoenix Police Department.[5] (Doc. 5 at 17.) To rely on such a report, plaintiffs must show it has a relationship to the facts and claims alleged in their complaint. *See, e.g.*, *Gerow v. U.S. Dep't of Just.*, No. CV-23-01059-PHX-DGC, 2024 WL 4528167, at *4 (D. Ariz. Oct. 17, 2024) (dismissing claim founded on DOJ report findings that did not relate to subject matter of complaint); *Frank v. City of Ville Platte*, No. 6:17-CV-01351,

[5] The court may take judicial notice of "matters of public record" referenced in the amended complaint without converting the motion to dismiss to a motion for summary judgment. *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001) (simplified).

2019 WL 1064261, at *5 (W.D. La. Mar. 6, 2019) (DOJ report had "no persuasive authority" related to plaintiff's claims where "[t]he situation presented [was] substantially different from the focus of the DOJ's investigation"). The most plaintiffs allege here is that the DOJ report found a practice of unconstitutionally arresting homeless individuals and that police once arrested individuals en masse for felony rioting without a proper showing of probable cause. (Doc. 5 at 17.) Regardless of the status of the report after DOJ retracted it, these findings do not plausibly demonstrate that Phoenix was deliberately indifferent to Austin's rights. Nowhere do plaintiffs allege Austin was homeless or participated in riots, that he was arrested for those reasons, that he was arrested en masse without individualized probable cause, or that the arrests referenced in the DOJ report were otherwise conducted in any way similar to Austin's. And the remaining allegations in Count Two amount to nothing more than legal conclusions and "formulaic recitation[s]" of the *Monell* elements. *Dougherty*, 654 F.3d at 900. Because plaintiffs have not provided facts which could plausibly support their claim, Count Two is dismissed.

**2. Liability for Alleged Fourteenth Amendment Violations**

Plaintiffs' *Monell* claims in Counts Four and Six seek to hold Phoenix liable for the alleged violations of Austin's right to adequate medical care in Count Three and plaintiffs' right to Austin's companionship in Count Five, respectively. Both counts rely on the identical contention that Phoenix had a "widespread practice" of "depriving individuals of adequate medical care." (Doc. 5 at 20, 23, 25.) Plaintiffs claim Phoenix's deliberate indifference to this practice was the moving force behind both alleged Fourteenth Amendment violations. (Doc. 5 at 23, 25.)

Both counts fail to state a plausible claim for relief. Plaintiffs have failed to plausibly allege any Fourteenth Amendment violation by Hamernick in Counts Three or Five so as to satisfy the first element of *Monell*. *See Gibson*, 290 F.3d at 1193–94. Even assuming plaintiffs had done so and established a practice of depriving detainees of adequate medical care—which is doubtful—they still have not plausibly demonstrated that any such practice was the "moving force" behind the alleged violations of Austin's and plaintiffs' rights such

that an appropriate policy could have prevented those violations. *Id.* There is no indication Hamernick knew Austin needed medical care until he entered the interview room, at which point he promptly rendered aid. (Doc. 5 at 12.) Plaintiffs' factual allegations do not explain how a more appropriate policy could have prevented harm to Austin when the facts suggest Hamernick did not know he needed care to begin with. And the incidents plaintiffs rely on cannot support their argument because they are specific to situations where—unlike here—officers knew or should have known a detainee needed medical care (Doc. 5 at 20–23). *See id.* at 1194–95; *Gerow*, 2024 WL 4528167, at *4. As such, Counts Four and Six are both dismissed.

## IV. Conclusion

Plaintiffs have not plausibly pleaded claims for constitutional violations under the Fourth Amendment against Murphy, Theriault, Scoggins, and Helmkamp or under the Fourteenth Amendment against Hamernick. They likewise have not pleaded *Monell* claims against the City of Phoenix in Counts Two, Four, or Six. The partial motion to dismiss those claims is therefore granted with leave to amend. Plaintiffs should be mindful that any amended complaint cannot allege facts which are inconsistent with the complaint now challenged. *See Oregon Clinic, PC v. Fireman's Fund Ins. Co.*, 75 F.4th 1064, 1073 (9th Cir. 2023).

Accordingly,

**IT IS ORDERED** that defendants' partial motion to dismiss (Doc. 14) is **GRANTED WITH LEAVE TO AMEND**. Consistent with this order, plaintiffs may continue to pursue their claims in Count One against Hamernick in his personal capacity. If plaintiffs wish to file an amended complaint consistent with the limited leave to amend granted in this order, they must do so no later than **November 2, 2026**. Any amended complaint must be accompanied by a redline identifying how the amended complaint differs from the currently-operative complaint. LRCiv 15.1. If no amended complaint is filed by the deadline, the Clerk of Court shall terminate defendants Murphy, Theriault, Scoggins, Helmkamp, and the City of Phoenix, and defendant Hamernick shall answer the

current complaint no later than **November 6, 2026**.

**IT IS FURTHER ORDERED** that pursuant to the court's order on December 3, 2025 (Doc. 6), the Clerk of Court shall terminate defendants Unknown Hamernick, Unknown Theriault, Unknown Murphy, Unknown Scoggins, Unknown Helmkamp, and Unknown Parties pursuant to Fed. R. Civ. P. 4(m).

**IT IS FURTHER ORDERED as follows**:

The parties are directed to meet, confer, and develop a Rule 26(f) Joint Case Management Report, which must be filed **<u>within 4 weeks of the date of this order</u>**. It is the responsibility of plaintiff(s) to initiate the Rule 26(f) meeting and prepare the Joint Case Management Report. Defendant(s) shall promptly and cooperatively participate in the Rule 26(f) meeting and assist in preparation of the Joint Case Management Report.

The Joint Case Management Report shall contain the following information in separately-numbered paragraphs.

1. The parties who attended the Rule 26(f) meeting and assisted in developing the Joint Case Management Report;
2. A list of all parties in the case, including any parent corporations or entities (for recusal purposes);
3. Any parties that have not been served and an explanation of why they have not been served, and any parties that have been served but have not answered or otherwise appeared;
4. A statement of whether any party expects to add additional parties to the case or otherwise amend pleadings;
5. The names of any parties not subject to the court's personal (or *in rem*) jurisdiction;
6. A description of the basis for the court's subject matter jurisdiction, citing specific jurisdictional statutes. If jurisdiction is based on diversity of citizenship, the report shall include a statement of the citizenship of every party and a description of the amount in dispute. *See* 28 U.S.C. § 1332;

7. A short statement of the nature of the case (no more than three pages), including a description of each claim, defense, and affirmative defense;
8. A listing of contemplated motions and a statement of the issues to be decided by those motions;
9. Whether the case is suitable for reassignment to a United States Magistrate Judge for all purposes or suitable for referral to a United States Magistrate Judge for a settlement conference;
10. The status of any related cases pending before this or other courts;
11. A discussion of any issues relating to preservation, disclosure, or discovery of electronically stored information ("ESI"), including the parties' preservation of ESI and the form or forms in which it will be produced;
12. A discussion of any issues relating to claims of privilege or work product;
13. A discussion of necessary discovery, which should take into account the December 1, 2015 amendments to Rule 26(b)(1) and should include:
    a. The extent, nature, and location of discovery anticipated by the parties and why it is proportional to the needs of the case;
    b. Suggested changes, if any, to the discovery limitations imposed by the Federal Rules of Civil Procedure;
    c. The number of hours permitted for each deposition. The parties also should consider whether a total number of deposition hours should be set in the case, such as twenty total hours for plaintiffs and twenty total hours for defendants. Such overall time limits have the advantage of providing an incentive for each side to be as efficient as possible in each deposition, while also allowing parties to allocate time among witnesses depending on the importance and complexity of subjects to be covered with the witnesses;
14. Proposed deadlines for each of the following events. In proposing deadlines, the parties should keep in mind the Case Management Order will

contain deadlines to govern this case and once the dates have been set the court will vary them only upon a showing of good cause. A request by counsel for extension of discovery deadlines in any case that has been pending more than two years must be accompanied by a certification stating the client is aware of and approves of the requested extension. The court does not consider settlement talks or the scheduling of mediations to constitute good cause for an extension. The parties must propose the following:

a. A deadline for the completion of fact discovery, which will also be the deadline for pretrial disclosures pursuant to Rule 26(a)(3). This deadline is the date by which all fact discovery must be *completed*. Discovery requests must be served and depositions noticed sufficiently in advance of this date to ensure reasonable completion by the deadline, including time to resolve discovery disputes. Absent extraordinary circumstances, the court will not entertain discovery disputes after this deadline;

b. Dates for full and complete expert disclosures and rebuttal expert disclosures, if any;

c. A deadline for completion of all expert depositions;

d. A date by which any Rule 35 physical or mental examination will be noticed if such an examination is required by any issues in the case;

e. A deadline for filing dispositive motions;

f. Case-specific deadlines and dates, such as the deadline to file a motion for class certification or a date on which the parties are available for a *Markman* (patent claim construction) hearing;

g. A date by which the parties shall have engaged in face-to-face good faith settlement talks;

h. Whether a jury trial has been requested and whether the request for a jury trial is contested, setting forth the reasons if the request is contested;

i. Any other matters that will aid the court and parties in resolving this case in a just, speedy, and inexpensive manner as required by Federal Rule of Civil Procedure 1;

15. A statement indicating whether the parties would prefer that the court hold a case management conference before issuing a scheduling order—and, if so, an explanation of why the conference would be helpful.

Dated this 19th day of October, 2026.

**Honorable Krissa M. Lanham**
**United States District Judge**